IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| CARESOUTH CAROLINA, INC.,<br>201 South Fifth Street<br>Hartsville, SC 29551,<br><br>    Plaintiff,<br><br>    v.<br><br>ANTHONY KECK, in his Official Capacity<br>as Director of the South Carolina<br>Department of Health and Human Services,<br>P.O. Box 8206<br>Columbia, SC 29202-8206<br><br>    Defendant. | Case No.: 3:14-cv-04311-CMC |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff CareSouth Carolina, Inc. ("CareSouth") files this Complaint to enjoin the South Carolina Department of Health and Human Services ("DHHS") from failing to pay CareSouth, a South Carolina Federally-qualified health center ("FQHC"), on the basis of reasonable costs for FQHC services it renders to patients who are enrolled in both Medicare and Medicaid, the so-called "full-benefit dual eligible" population. Defendant Anthony Keck, in his official capacity as Director of DHHS, is responsible for the administration of the South Carolina Medicaid program, and has adopted a reimbursement policy for those dual eligible beneficiaries that is contrary to established federal cost-related FQHC payment requirements and that ignores Medicaid's proper role as payor of last resort. As a result of this policy, CareSouth has been underpaid for Medicaid services provided to dual eligible beneficiaries for the past two and a

half years, and this underpayment has severely hindered CareSouth's ability to serve its patients, who are in need of high-quality affordable medical care.

## JURISDICTION AND VENUE

1.  This action arises under the provisions of Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.* (hereinafter the "Medicaid statute"), including 42 U.S.C. § 1320a-2, as well as 42 U.S.C. § 1983.

2.  The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper in this District under 28 U.S.C. § 1391(b). The declaratory and injunctive relief sought in this action is authorized under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.

## PARTIES

3.  Plaintiff CareSouth is an Internal Revenue Code § 501(c)(3) not-for-profit corporation established under the laws of the State of South Carolina that serves as a community health center providing comprehensive primary and preventive health care services at eleven locations around the state.

4.  The South Carolina Department of Health and Human Services ("DHHS") is designated as the "single state agency" that administers and is responsible for South Carolina's Medicaid program. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10. It is the recipient of funds allocated to South Carolina under the Medicaid statute and is responsible for administering those funds in accordance with the statute, regulations promulgated thereunder, the State Medicaid plan, and the terms of any agreement with the Federal Government regarding those funds. Responsibilities for the State's management and operation of the Medicaid program are lodged within DHHS. *See* South Carolina State Medicaid Plan § 1.1(a).

5.      Defendant Anthony Keck is the duly appointed Director of DHHS. As such, he is the South Carolina State official ultimately charged with supervision and control of public assistance programs and services, including the Medicaid program. He is sued in his official capacity.

## LEGAL FRAMEWORK

### Health Centers

6.      "Community health centers" are primarily § 501(c)(3) nonprofit organizations that provide comprehensive primary and preventive care to individuals and families in medically underserved communities. Community health centers are eligible to receive grant funds under Section 330 of the Public Health Service ("PHS") Act, 42 U.S.C. § 254b, in order to provide care to persons in the health center's community who are uninsured or otherwise unable to pay for medical services that the health center provides. 42 U.S.C. §§ 254b(e), (k). To qualify as a community health center under Section 330 of the PHS Act, a center must: (1) be located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) be community based (a majority of its Board of Directors are patients of the center, "who, as a group, represent the individuals being served by the center . . ." (42 U.S.C. § 254b(J)(3)(H)(i)); (3) provide an especially comprehensive range of primary health services to its patients through staffs of physicians and other health care providers (42 U.S.C. §§ 254b(a)(1)(A) and 254b(j)(3)(A)); (4) provide health care services to Medicaid recipients (42 U.S.C. § 254b(j)(3)(E); and (5) serve all residents of its community, regardless of any patient's ability to pay. 42 U.S.C. §§ 254b(a)(1) and 254b(j)(3)(G)(i). CareSouth meets the above requirements and qualifies as community health center under Section 330 of the PHS Act.

3

7.      Federal grant funds awarded under Section 330 of the PHS Act are to be used for economically disadvantaged patients who are unable to pay for medical services that the health center provides; such funds may not cover the costs for which public or private insurance or other sources are liable pursuant to their provider agreements with the health center. 42 U.S.C. § 254b(e), (k)). Consequently, community health centers must make every reasonable effort to collect appropriate reimbursement from public and private insurers, including Medicaid. 42 U.S.C. § 254b(k)(3)(F).

## The Medicaid Program

8.      The Medicaid program was initiated in 1965, and is jointly supported by federal and state funds. The Medicaid program makes health care services available to needy individuals and families whose resources are insufficient to meet the costs of necessary medical services. *See* 42 U.S.C. § 1396-1(1). Participation in Medicaid by any state is voluntary; however, once a state elects to participate, the state must comply with all federal requirements. South Carolina has elected to participate in Medicaid.

9.      A state that elects to participate in Medicaid must submit and have approved a state Medicaid plan, which contains provisions and requirements regarding groups of individuals covered, eligibility conditions, medical care and services, reimbursement, and federal-state requirements. *See generally* 42 U.S.C. §§ 1396a(a)(1)-(65) and 42 C.F.R. Part 430 *et seq.* A state plan "must describe the policy and methods to be used in setting payment rates for each type of service included in the State's Medicaid program." 42 C.F.R. § 447.201(b).

10.     Under the Medicaid program, a community health center is treated as an FQHC if it is a recipient of funds under Section 330 of the PHS Act and maintains an outpatient health program, as CareSouth does. 42 U.S.C. § 1396d(*l*)(2)(B). "Federally-qualified health center

4

services . . . and any other ambulatory services offered by a Federally qualified health center" *must* be covered under a State's Medicaid plan.  42 U.S.C. §§ 1396d(a)(2)(C) and 1396a(a)(10)(A).  As such, FQHC services are a Medicaid program beneficiary right for categorically needy individuals.  42 U.S.C. § 1396d(a)(2)(C).  The Medicaid statute defines FQHC services to include those provided by FQHCs in the Medicare program (physician services, mid-level practitioners, clinical psychologists, social workers, *etc.*) as well as "any other ambulatory services" provided under a state's Medicaid plan and offered by the FQHC.  42 U.S.C. § 1395x(aa)(1); 42 U.S.C. § 1396d(a)(2)(C).

11.     Since 1989, Congress has imposed special requirements for the payments States must make to FQHCs for services provided to Medicaid patients.  The Omnibus Budget Reconciliation Act ("OBRA") of 1989 set an FQHC's reimbursement at "100 percent of [its] costs which are reasonable . . . ."  42 U.S.C. § 1396a(a)(13)(E) (later reclassified as 42 U.S.C. § 1396a(a)(13)(C) and amended by 42 U.S.C. § 1396a(bb)).  Congress' goal in passing that FQHC payment provision was made clear in legislative history:  to ensure that federal grant funds awarded to health centers under Section 330 of the PHS Act would not have to be diverted to cover the costs that rightfully should be paid by Medicaid.  H.R. Rep. No. 101-247, at 392-93, reprinted in 1989 U.S.C.C.A.N. 2118-19.  As stated in that report:

> The Subcommittee on Health and Environment heard testimony that, on average, Medicaid payment levels to federally funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients.  The role of [health centers]…is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay.  *To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.*

*\*\*\**

> To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing these services.

*Id.* (Emphasis added).

12. In 2000, Congress amended the FQHC payment methodology as part of the Benefits Improvement and Protection Act ("BIPA"). H.R. 5661, section 702, as enacted in Pub. L. No. 106-554 (Dec. 21, 2000) and now (after a later technical amendment), codified at 42 U.S.C. § 1396a(bb). That amendment implemented a cost-related Medicaid Prospective Payment System ("PPS"), which requires states to reimburse FQHCs on a prospective, or predetermined, rate per patient visit (also known as an "encounter"), basis. 42 U.S.C. § 1396a(bb).

13. The per visit reimbursement rate for each FQHC, which is uniform for patient encounters regardless of the actual service performed during the visit, is computed on the basis of the average of 100 percent of the particular FQHC's reasonable costs for covered services in federal fiscal years 1999 and 2000. 42 U.S.C. § 1396a(bb)(2). Known as the "PPS rate," this new rate became effective January 1, 2001 and was used for the balance of fiscal year 2001. Thereafter, that PPS rate is increased each year by a standard medical inflation factor, known as the Medicare Economic Index ("MEI") and adjusted for changes in the scope of services offered by the health center. 42 U.S.C. § 1396a(bb)(3). In short, beginning on January 1, 2001, each FQHC was required to be paid at a PPS rate.

14. The Medicaid statute also provides states with the option to reimburse FQHCs using an "alternative payment methodology" or "APM." 42 U.S.C. 1396a(bb)(6). The APM rate must result in payment to the FQHC which is at least equal to what the FQHC would otherwise receive under the default PPS reimbursement rate, and must be agreed to by the State

6

and the participating FQHC. South Carolina has elected to reimburse FQHCs under an APM, and CareSouth's Medicaid Provider Agreement notes that its reimbursement will be pursuant to such an APM that "is at least equal to the amount that would be received using the PPS methodology." *See* South Carolina State Medicaid Plan Attachment 4.19B, page 1F, at 2(c). The APM further provides that adjustment to the rate will be made "on a retrospective basis based upon review of the FQHC's fiscal year end cost report." Of that APM rate, the patient has a minimal copayment responsibility of $3.30 for FQHC services which the provider is obligated to attempt to collect directly from the patient and for which DHHS is not responsible for making payment.

15.     CareSouth's reimbursement rate under South Carolina's APM rate is currently set at $187.69 per patient visit based on CareSouth's fiscal year 2011 Medicaid cost report. As no cost report has been settled with DHHS since that date, pursuant to the South Carolina State Medicaid Plan CareSouth continues to be reimbursed at its 2011 APM rate for Medicaid services until a subsequent cost report is settled.

### The Medicare Program

16.     The Medicare program was also enacted in 1965 to provide financing for medical procedures for certain persons with disabilities and people at least 65 years of age. 42 U.S.C. § 1395 *et seq.* Unlike Medicaid, Medicare covers only FQHC "core services," which are services of physicians, mid-level practitioners (nurse practitioners and physician assistants), clinical psychologists and clinical social workers, as well as certain preventive and primary care services required by the PHS Act and other preventative services. 42 U.S.C. § 1395k(a)(2)(D)(ii); 42 U.S.C. § 1395x(aa)(1), (3).

17. For those specified FQHC services, Medicare reimburses health centers at a unique cost-based All-Inclusive Reimbursement Rate ("AIRR") based on reasonable costs reported in the FQHC's annual Medicare cost report. 42 C.F.R. § 405.2462(b)(1). The rate for each reporting period is determined by "dividing the estimated total allowable costs by estimated total visits." 42 C.F.R. § 405.2464(a)(2). Medicare makes payments to an FQHC during the cost year on the basis of the estimated AIRR for that year, subject to an annual reconciliation whereby actual costs and visits are compared to the FQHC's estimates. In the event the FQHC's actual costs and visits differed from the initial estimate used to determine in-year payments, the center may be owed, or owe, additional Medicare funds. 42 C.F.R. § 405.2466(b)(2). Medicare payments are also subject to an upper payment limitation ("UPL") that caps the AIRR per-visit rate. 42 C.F.R. § 405.2468(d), (e).

18. Medicare is responsible for reimbursing an FQHC for 80% of the FQHC's AIRR rate, with the beneficiary responsible for Medicare coinsurance, which is equal to 20% of reasonable charges for the service. 42 U.S.C. § 1395cc(a)(2)(A)(ii); 42 C.F.R. § 405.2462(b)(3) (The annual deductible that normally applies to Medicare Part B services is waived for FQHC services, 42 U.S.C. § 1395*l*(b)(4)). However, for most full-benefit dual elgible beneficiaries, as described below, the Medicaid program is obligated to cover that coinsurance liability, so that the patient's financial responsibility does not exceed the nominal Medicaid copayment. For services provided to a dual eligible beneficiary, CareSouth should receive 80% of its AIRR rate (plus any coinsurance payment) from Medicare first, before submitting a secondary claim to Medicaid for the remaining amount necessary to bring CareSouth's total payment equal to its Medicaid APM rate.

**Payment for Dual Eligible Beneficiaries**

8

19. Medicare and Medicaid intersect for the payment of services provided to dual eligible beneficiaries in two areas. First, Medicaid has an overarching duty to serve as payor of last resort for dual eligible beneficiaries, and under the state Medicaid plan, a Medicaid agency is therefore required to identify other insurance available to a Medicaid beneficiary, including Medicare, prior to paying its share. 42 U.S.C. § 1396a(a)(25); 42 C.F.R. § 433.139(b)(1). Thus, for an FQHC service where the Medicaid PPS rate is higher than the Medicare rate, the FQHC would bill Medicare first (for 80% of the Medicare allowed amount), and then submit a claim to Medicaid for the difference between Medicare's payment and the (greater) Medicaid PPS (or APM) rate (minus the $3.30 FQHC Medicaid copayment amount for which the patient is responsible).

20. Second, through a program known as "medicare cost-sharing" that is distinct from Medicaid's overarching responsibility as payor of last resort, Medicaid is responsible for the payment of Medicare costs for certain disadvantaged dual eligible beneficiaries. 42 U.S.C. §§ 1396a(a)(10)(E), 1396d(p)(3). Under this program, states participating in Medicaid are required to make assistance available to pay for the Medicare coinsurance amount, along with Medicare premiums and deductibles, if applicable. *See* 42 U.S.C. § 1396a(a)(10)(E)(i).

## FACTUAL ALLEGATIONS

21. Until recently, DHHS followed the payment model described in ¶¶ 18-19 above, whereby the State, when reimbursing CareSouth for FQHC services provided to dual eligible beneficiaries, would pay an amount equal to the Medicaid APM payment amount less the amount paid by Medicare and the nominal patient responsibility; essentially, South Carolina would be responsible for paying CareSouth the difference between its higher Medicaid APM rate

9

and the lesser amount paid by Medicare through what is known as a "crossover" claim submitted to Medicaid under its role as payor of last resort.

22.     However, on July 8, 2011, DHHS gave notice of proposed changes to its reimbursement for Medicaid services provided under the South Carolina State Plan based on its interpretation of the scope and reach of the "medicare cost sharing" benefit. DHHS stated that effective August 1, 2011, it proposed to change the "standard for payment of professional claims with third party coverage including Medicare." Specifically, DHHS proposed to limit the Medicaid payment to the "Medicaid allowed amount less the amount paid by the third party," or, in the event a provider "files an assigned claim for a dual eligible recipient," the Medicaid payment would be limited to the amount of the third party coinsurance and deductible.

23.     DHHS purported to carry out that policy change through State Plan Amendment ("SPA") 11-012, which took effect on August 9, 2011. In that Amendment, which specifically concerns the payment of Medicare "Deductible/Coinsurance," DHHS announced its intention to cap the State's cost-sharing payment for Part B-covered services (including FQHC services) at "the Medicaid claim payment less the amount paid by Medicare *not to exceed the sum of the Medicare coinsurance and deductible.*" *See* SC State Plan, Supp. 1 to Att. 4.19-B, p. 3 (emphasis added). This payment policy went into effect for FQHC services on January 1, 2012, and DHHS has since used the SPA to effectively limit Medicaid's full financial obligation under its role as payor of last resort to only the lesser amount of "medicare cost sharing."

24.     When CareSouth recently inquired about DHSS's position regarding payment for FQHC services provided to full-benefit dual eligible beneficiaries, especially given that the SPA concerns only "medicare cost sharing" rather than full payment for FQHC services, DHHS responded by confirming that it "reimburses FQHCs the lesser of the Medicaid allowed amount

10

less the Medicare paid amount not to exceed the sum of the Medicare coinsurance and deductible amount," and that it was "not our intent to change our reimbursement policies regarding FQHCs as it relates to dual eligible beneficiaries."

25.     Therefore, since January 1, 2012, CareSouth has been reimbursed at the lower Medicare rate for FQHC services provided to dual eligible beneficiaries, as its total payment has amounted to the Medicare payment plus the Medicare coinsurance amount, rather than payment sufficient to bring its total reimbursement equal to its Medicaid APM rate.

## HARM TO PLAINTIFF

26.     Because of DHHS's change in policy, from January 1, 2012 until the end of July, 2014 CareSouth has been underpaid by $1,323,197.94 for FQHC services provided to dual-eligible beneficiaries. Specifically, from January 1, 2012 through the end of the 2012 cost year on May 31, CareSouth was underpaid by $251,721.83. For cost year 2013, ending May 31, 2013, it was underpaid by $588,247.84. For cost year 2014, it was underpaid by $445,682.06. Finally, from June 2014 to the end of July 2014, Care South was underpaid by $37,546.21.

27.     The injuries resulting from DHHS's underpayment described above are significant. They include the denial of much-needed Medicaid funds to CareSouth, the denial of FQHC services to CareSouth's Medicaid patients, and forcing CareSouth to use § 330 grant funding to subsidize the South Carolina Medicaid program. This ultimately diverts funds that should be reserved for treating CareSouth's patients who are without insurance or lack the means to pay other health care providers.

28.     As a result of South Carolina's underpayment, CareSouth has been forced to eliminate staff positions that improve patient health and continuity of care, halt implementation of a new electronic health record system, and eliminate benefits to its employees. Further,

11

CareSouth was placed into a financial recovery program by the U.S. Department of Health and Human Services that prevented it from competing for new federal awards, and that imposed onerous and time-consuming grant conditions. If this underpayment continues, CareSouth will be forced to cut back on services and will continue to lose patients. It will be unable to retain competent physicians and other health care staff, and the quality and amount of care provided to its patients will decline as a result. Essentially, permitting DHHS to continue with this unlawful payment practice will jeopardize CareSouth's ability to serve the patients in its communities who are most in need of affordable high-quality medical care.

## CAUSES OF ACTION

### COUNT I

### 42 U.S.C. § 1983
### Violation Of The FQHC Payment Provision In 42 U.S.C. § 1396a(bb)

29.    CareSouth re-alleges and incorporates by reference paragraphs 1-28, above.

30.    DHHS's policy of paying CareSouth at the amount of Medicare coinsurance for FQHC services provided to dual eligible beneficiaries rather than at a higher amount sufficient to bring CareSouth's total reimbursement equal to its APM rate as specified in South Carolina's State Medicaid Plan violates 42 U.S.C. § 1396a(bb) because DHHS has failed to reimburse CareSouth at a cost-based rate for FQHC services as required by federal law.

31.    DHHS's decision rests on an erroneous understanding of Medicaid's roles as payor of last resort for services provided to dual eligible beneficiaries. For FQHC services provided to those beneficiaries, Medicaid is the payor of last resort, and South Carolina must make payment sufficient to bring CareSouth's total reimbursement up to the full APM rate as specified in its Medicaid State Plan, rather than capping Medicaid payments at the lower Medicare coinsurance amount which is subsumed by Medicaid's FQHC payment obligations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter an order:

1.  Declaring DHHS's decision to pay CareSouth for FQHC services provided to full-benefit dual eligible beneficiaries at the amount of the Medicare coinsurance payment rather than at CareSouth's full Medicaid APM rate contrary to law;

2.  Enjoining DHHS from continuing to pay CareSouth in a manner contrary to federal law; and

3.  Afford CareSouth such other further relief as the Court deems just and equitable.

Respectfully submitted,

s/James C. Cox, III
James C. Cox, III.     (Fed Id No. 7496)
Greg B. Collins         (Fed Id No. 10350)
GRIER, COX & CRANSHAW, LLC
Post Office Box 2823
Columbia, South Carolina 29202
Tele:  (803) 731-0030
Fax:  (803) 731-4059
tcox@griercoxandcranshaw.com
gcollins@griercoxandcranshaw.com

Edward T. Waters*
Gregory M. Cumming*
FELDESMAN TUCKER LEIFER FIDELL LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
ewaters@ftlf.com
gcumming@ftlf.com

* Application for admission *Pro Hac Vice* pending

13